# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JENNIFER KIDD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10-0020 |
| | ) | Judge Campbell |
| CIGNA CORPORATION d/b/a CIGNA | ) | |
| GROUP INSURANCE, PHOTOFAX, | ) | |
| INC., CHRIS ISENHART, Individually, | ) | |
| and SELECT PHYSICAL THERAPY | ) | |
| HOLDINGS, INC. d/b/a SELECT | ) | |
| PHYSICAL THERAPY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

This invasion of privacy case arose after Plaintiff, Dr. Jennifer Kidd ("Dr. Kidd"), was secretly videotaped undergoing a Functional Capacity Evaluation ("FCE") related to her receipt of Long-Term Disability ("LTD") benefits. Pending before the Court are several motions, including summary judgment motions filed by Defendants Photofax, Inc. ("Photofax") and Chris Isenhart ("Mr. Isenhart") (Docket No. 32), Defendant Select Physical Therapy Holdings Inc. d/b/a Select Physical Therapy ("Select") (Docket No. 37), and Defendant CIGNA Corporation d/b/a CIGNA Group Insurance ("CIGNA") (Docket No. 41). Also pending is a Motion to Dismiss filed by CIGNA (Docket No. 44), as well as Dr. Kidd's Motion to Amend Complaint (Docket No. 77). Finally, Dr. Kidd has filed a Motion for Review of Magistrate Judge's Order (Docket No. 55). With the exception of Select's Motion for Summary Judgment which Dr. Kidd has not opposed, those motions have been fully briefed by the parties.

# I. **FACTUAL BACKGROUND**

Dr. Kidd is an anesthesiologist who formerly practiced with Anesthesia Medical Group, P.C. in Nashville, Tennessee. She allegedly can no longer work in that capacity as a result of being diagnosed with Complex Regional Pain Syndrome.

On September 20, 2007, Dr. Kidd applied for LTD benefits from Life Insurance Company of North America ("LINA"), a CIGNA subsidiary. After an initial denial, Dr. Kidd's benefit claim was approved in November 2008 for the period from February 8, 2008 to December 31, 2008. At the time of approval, Dr. Kidd was notified that she would be required to participate in an FCE to reassess her right to continue receiving LTD benefits. The FCE was scheduled for January 8 and 9, 2009, at Select's clinic located at 5515 Edmonson Pike in Nashville, Tennessee.

Select's physical therapy facility on Edmonson Pike is in a strip mall and fronts a parking lot. It has three exterior windows from which one can see into the building from the sidewalk or parking lot. Likewise, those inside the building can look out and see the parking lot, as well as an office building which sits to one side, and across the street.

On the scheduled dates, Dr. Kidd participated in an FCE conducted by Select's Center Manager, Catherine Byrd ("Ms. Byrd").[1] Also present, and supervising Ms. Byrd, was Felisa T. Odle ("Ms. Odle"), Select's Manager of Clinical Operations.[2]

During the FCE, Dr. Kidd performed several activities, including lifting five pound weights, walking on a treadmill, and climbing some steps. She also stooped, crouched, and crawled, used

---

[1]Dr. Kidd signed a consent form in which she consented to the physical therapist submitting a written report to LINA.

[2]A receptionist was present at the clinic, but it is unclear exactly where she was located during the course of the examination.

various lever devices, put together wooden puzzles, placed wooden pegs into holes, and fished marbles and pinto beans out of a box of rice. A couple of the activities (such as lifting weights and walking on the treadmill) are the same sort of activities which Dr. Kidd undertakes in full view of others while working out at her local YMCA several days a week.

Some, but not all, of Dr. Kidd's actions could be seen through one or more of the windows of the building. Dr. Kidd did not ask anyone to cover the windows, or otherwise block her from view. According to Dr. Kidd, she did not know that anyonone could see into the examination area from outside the building because medical facilities typically utilize one-way glass to protect patients from being seen from outside. She further claims that it never entered her mind that anyone would attempt to watch her from outside the facility.

Unbeknownst to Dr. Kidd, her FCE was videotaped from the parking lot by Mr. Isenhart who works for Photofax. Photofax conducts surveillance and investigations, and was hired by LINA to conduct video surveillance on Dr. Kidd in January 2009.[3]

Photofax's surveillance request form indicates CIGNA wanted Dr. Kidd surveilled from January 7 to 10, 2009, and specifically noted that Dr. Kidd was scheduled for her FCE on January 8 and 9, 2009, at Select's facility on Edmonson Pike. Jennifer Holder ("Ms. Holder"), a CIGNA fraud investigator who actually works for LINA, made the surveillance request.

Ms. Holder testified in her deposition that the dates selected for surveillance corresponded with the FCE because it was clear that Dr. Kidd would be leaving her home to attend the sessions.

---

[3]The relationship between Photofax and CIGNA was governed by a Professional Services Agreement and a Business Associate Agreement, both dated February 12, 2008. The latter Agreement provided, among other things, that the parties were "entering into this Agreement to comply with the Health Insurance Portability and Accountability Act of 1996" ("HIPAA").

Ms. Holder also indicated that she understood the FCE might be videotaped if it could be seen from a public place because CIGNA wanted to get "any activity" that could be videotaped. (Holder Depo. at 27-28). Indeed, according to Ms. Holder, it is standard practice for CIGNA to have investigators film both medical examinations and FCEs, if possible. (Holder Depo. at 10).[4]

As requested, Mr. Isenhart conducted surveillance on Dr. Kidd from January 7 to January 10, 2009. The video surveillance included images of cars traversing the road in front of Dr. Kidd's residence, Dr. Kidd outside of a Starbucks coffee shop, inside and outside a TJ Maxx store, carrying a shopping bag, getting in and out of her car, and driving.

As for the filiming of the FCE, Mr. Isenhart followed Dr. Kidd from her home to Select on both days of the FCE. Both he and she parked in the parking lot. Mr. Isenhart captured Dr. Kidd on film walking into Select and then videotaped her inside the facility from his parked car. The video images do not include the entirety of the examinations, all of Dr. Kidd's movements, or all her body.[5] The videotape contains no sound, no written description of events, and captures only that which could be seen by anyone looking into the window from the parking lot, although the film is enhanced at parts due to Mr. Isenhart's use of a zoom lens.

For the four day period of surveillance, Mr. Isenhart compiled 57 minutes of videotape. He submitted the tape and a written report to Ms. Holder. In his written report, Mr. Isenhart noted that Dr. Kidd was being surveilled because CIGNA wanted to know her "current level of daily activity,"

---

[4]As will be noted in the discussion relating to CIGNA's Motion to Dismiss, many of the actors in this case do not differentiate between CIGNA and LINA, and use the names interchangeably. The Court will do the same, except where differentiation of these entities is necessary for purposes of the legal analysis.

[5]For example, in many of the frames, one cannot see the lower portion of Dr. Kidd's body.

and that Dr. Kidd "reportedly suffers from Reflex Sympathetic Dystrophy." (Isenhart Depo. Ex. 4, Docket No. 41-3 at 2).

Dr. Kidd did not learn about the video surveillance until her attorney requested records from CIGNA in the Spring of 2009, after her claim for benefits had again been denied. Dr. Kidd admittedly expected CIGNA to conduct video surveillance of her as part of her claim for LTD benefits, and she is not offended by the images taken outside of her house, while she was driving, running errands, shopping, or even walking into Select. However, Dr. Kidd did not expect that CIGNA would go so far as to tape her FCE which, she believed, was being conducted in private, with only licensed therapists present. In her experience, the filming of a patient's medical examination is never allowed, unless the patient signs a written waiver agreeing to the same.

Dr. Kidd did not seek medical treatment for any alleged injury caused by the Defendants' activities, nor has she changed her daily activities since learning about the video surveillance. She does claim, however, that she was "shocked and upset" when she learned that the FCE was filmed without her knowledge or consent. (Kidd Aff. 6, Docket No. 74 at 2).

## II. <u>APPLICATION OF LAW</u>

A. **CIGNA'S MOTION TO DISMISS**

As indicated at the outset, Dr. Kidd sues, among others, CIGNA Corporation d/b/a CIGNA Group Insurance. CIGNA moves to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure, arguing that this Court lacks personal jurisdiction over it. In support of that position, CIGNA submits an affidavit from Franklin C. Barlow ("Mr. Barlow"), the Accounting Director for CIGNA.

In his affidavit, Mr. Barlow states: (1) CIGNA Corporation is a Delaware corporation with

its principal place of business in Philadelphia, Pennsylvania; (2) CIGNA is not licensed to do business in Tennessee, does no business and pays no taxes in this state, has no employees, bank accounts or property here, and has no office or place of business in Tennessee; (3) CIGNA is a holding company which owns stock in other companies; (4) CIGNA is not an insurance company or licensed to operate as such, does not offer any insurance products or services, and does not enter into agency contracts to provide insurance or insurance services; (5) CIGNA has not had any contractual relationship with Dr. Kidd or her former employer, Anesthesia Medical Group, P.C., and had no involvement in processing Dr. Kidd's claim for benefits; and (6) CIGNA had no role in investigating Dr. Kidd, and had no business or contractual relationship with either Select Physical Therapy or Photofax. (Docket No. 45, Barlow Aff. ¶¶ 2-3, 5-12). Mr. Barlow also avers that "CIGNA Group Insurance" does not refer to any legal entity, but rather it is a registered service mark of CIGNA Intellectual Property, Inc., licensed for use by subsidiaries of CIGNA. (Id. ¶ 4).

In order for this Court to have personal jurisdiction over a defendant, the plaintiff must show the defendant has sufficient minimum contacts with Tennessee such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)(citation omitted). Minimum contacts exist where the defendant purposefully avails itself of the privilege of conducting activities within the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). A defendant who invokes the benefit and protections of the state's laws "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

A court may have either general or specific jurisdiction over a defendant. Burger King, 471 U.S. at 472-73. "General jurisdiction is established 'when a defendant has continuous and

6

systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims.'" Fortis Corporate Ins. v. Viken Ship Mgmt., 450 F.3d 213, 218 (6th Cir. 2006)(citation omitted). "Specific jurisdiction subjects the defendant to 'suit in the forum state only on claims that arise out of or relate to a defendant's contacts with the forum.'" Id. (citation omitted).

In this case, Dr. Kidd points to no evidence which supports the conclusion that CIGNA has continuous and systematic contacts with Tennessee, Mr. Barlow's affidavit indicates otherwise, and, therefore, the Court finds no basis for general jurisdiction. As for specific personal jurisdiction, Dr. Kidd asserts that LINA and CIGNA acted in concert to hire a private investigator and to have her filmed while she underwent her FCE. Specifically, Dr. Kidd argues:

> . . . The minimum contacts in this case are that the parent corporation CIGNA, acting through the use of various subsidiaries and registered service marks, hired a private investigator to videotape Plaintiff while undergoing a medical examination in Nashville, Tennessee. While the parent contends that LINA is the proper defendant, it was Connecticut General, at least nominally, that entered into the contract to hire PhotoFax, CIGNA Services that drafted the ethics statement attached thereto and an employee of CIGNA Audit who forwarded the surveillance report and tape to Rui Cunha at CIGNA Group Insurance. . . .
>
> \*                          \*                          \*
>
> LINA, Connecticut General, CIGNA Services, CIGNA Audit and/or CIGNA Group Insurance were acting as CIGNA's agent in this transaction to hire a private investigator. . . . It is apparent that CIGNA is more than just a holding company uninterested in the day-to- day operations of its subsidiaries. It required that only an approved investigative services company like PhotoFax be used for conducting the surveillance of Dr. Kidd, required that PhotoFax enter into an agreement with Connecticut General, required that PhotoFax abide by ethical standards establish by CIGNA Services, had Dr. Kidd's claim investigated by CIGNA Audit and handled by CIGNA Group Insurance.

(Docket No. 73 at 8-9).

The exercise of specific jurisdiction over a non-resident defendant is valid only if it meets both the state long-arm statute and constitutional due process requirements. Calphalon Corp. v.

Rowlette, 228 F.3d 718, 721 (6ᵗʰ Cir. 2000).  Tennessee's long-arm statute provides for jurisdiction to the full extent allowed under the due process clause relating to "the transaction of any business within the state."  T.C.A. § 20-2-214. Section 20-2-214(c) also permits the exercise of personal jurisdiction over a defendant when it transacts business in the state through an "agent or personal representative."  T.C.A. § 20-2-214(c).

The Sixth Circuit has set forth three criteria for determining whether specific jurisdiction may be exercised consistent with due process.  Those criteria are:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Southern Machine Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381-382 (6ᵗʰ Cir. 1968).  The purposeful availment prong of the test is viewed by the Sixth Circuit "as 'essential' to a finding of personal jurisdiction,"  Intera Corp. v. Henderson, 428 F.3d 605, 616 (6ᵗʰ Cir. 2005), and the question of whether a defendant availed itself of the privilege of acting in a state is determined by the defendant's actions and not the plaintiff's actions.  Nationwide Mut. Ins. Co. v. TRYG Intern. Ins. Co., 91 F.3d 790, 795-96 (6ᵗʰ Cir. 1996).

In this case, and notwithstanding the fact that Tennessee provides for jurisdiction to the full extent of the due process clause, Dr. Kidd has failed to show that the named defendant, "CIGNA Corporation d/b/a CIGNA Group Insurance" purposefully availed itself of conducting business in Tennessee.  Recall that Dr. Kidd's benefits were through LINA, yet she seeks to hold CIGNA Corporation liable for the investigation related to those benefits and does so by pointing to the

activities not of CIGNA Corporation *per se*, but of CIGNA Services, CIGNA Audit, and CIGNA Group Insurance, all of which allegedly acted as agents of CIGNA Corporation. This is a tenuous basis on which to establish jurisdiction over CIGNA Corporation, particularly since "[p]arent and subsidiary corporations are presumed to be separate and distinct legal entities," and jurisdiction over one does not automatically establish jurisdiction over the other. <u>Gordon v. Greenview Hosp., Inc.</u>, 300 S.W.3d 635, 651 (Tenn. 2009); <u>see</u>, <u>Kling v. ADC Group Long-Term Disability Plan</u>, 2004 WL 2370682 at *2 (D. Minn. 2004)(no personal jurisdiction where only link between CIGNA Corporation and forum state was that it was parent company of LINA) <u>Nat'l Production Workers Union Trust v. CIGNA Corp.</u>, 2007 WL 1468555 at *5 (N.D. Ill. 2007)("LINA is a third-tier subsidiary of CIGNA Corporation" because CIGNA Corporation is not even an "indirect parent" or "grandparent of LINA," but rather "is separated by at least two corporate degrees from LINA").

Dr. Kidd argues, "the actions of a parent corporation may be attributable to a subsidiary corporation (1) when one corporation is acting as an agent for the other or (2) when the two corporations are essentially the alter egos of each other." <u>Gordon</u>, 300 S.W.3d at 652 (footnote omitted). However, because Dr. Kidd presents no evidence that LINA is a "sham or dummy" company, or that it and CIGNA corporation "are, in fact, identical and indistinguishable," <u>id</u>. at 653, the Court turns to the issue of whether CIGNA corporation is subject to jurisdiction under an agency theory of liability.

"The concept of agency, in its broadest sense, includes every relation in which one person or entity acts for or represents another." <u>Id</u>. "The analysis hinges on the right to control the agent's actions, . . . and, ultimately the fact of actual control over the agent." <u>Id</u>. (citation omitted). Still, for there to be specific personal jurisdiction in this case, Dr. Kidd must show that CIGNA

Corporation "purposefully availed itself of the privilege of acting in [Tennessee] or purposefully caused a consequence []here." Aristech Chem. Intern. Ltd. v. Acrylic Fabricator, 138 F.3d 624, 628 (6th Cir. 1998); see, Balance Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 698 (6th Cir. 2000)(exercise of personal jurisdiction over out-of-state agent should depend on "traditional notions of fair play and substantial justice; i.e. whether she purposely availed herself of the forum and the reasonably foreseeable consequences of that availment"); Dean v. Motel 6 Operating L.P., 134 F.3d 1269, 1274 (6th Cir. 1998)(a plaintiff "must provide sufficient evidence for us to conclude that [the parent corporation] is being brought into court for something that it has done, not for something that [the subsidiary] has done").

Dr. Kidd's complaint revolves around what she believes to be an improper videotaping of her FCE examination, but she has presented nothing which shows that "CIGNA Corporation d/b/a CIGNA Group Insurance" had anything to do with that allegedly tortious act. Although there is a Professional Services Agreement and corresponding Business Associate Agreement between "Connecticut General Life Insurance Company" of Philadelphia, Pennsylvania, and Photofax Surveillance Company of Gilberts, Illinois, those documents are general agreements related to possible investigations and surveillance, and set forth how the same are to be conducted. They are not specifically directed to Tennessee, or to the conduct at issue in this case. Further, while the "company" named in the Professional Services Agreement is Connecticut General Life and that entity is also listed as the contracting "company" in the Business Associate Agreement, the agreements are not exclusively between Connecticut General and Photofax, but rather indicate that any of Connecticut General's affiliates or subsidiaries could utilize Photofax's services under the umbrella agreement. (Docket Nos. 75-5 ¶ 2d & 75-6 at 1). Thus, the fact that LINA used Photofax

to surveil Dr. Kidd in this case does not mean that those actions are attributable to CIGNA.

The other evidence to which Dr. Kidd points also does not show LINA was acting in concert with, or as an agent of, CIGNA Corporation when LINA decided to have Dr. Kidd followed and filmed. The investigation was requested by Ms. Holder and, while she stated in her deposition that she worked for "CIGNA" as a fraud investigator, and while she forwarded Photofax's report to "Rui Cunha"("Ms. Cunha") over the signature block "Jenna Holder, Special Investigations, CIGNA Audit," Ms. Holder also testified that her actual employer was LINA and made clear that she did not understand CIGNA's or LINA' corporate structure. (Holder Depo. at 21-22). See, Nat'l Production, 2007 WL 1468555 at *4 & *6 (plaintiff must show that employee "was doing CIGNA corporation's bidding[,] rather than LINA's" and "[i]t is not relevant to the issue of minimum contacts whether CIGNA Corporation's employees are confused about corporate structure").

Moreover, Ms. Holder's cover-letter to Ms. Cunha was on "CIGNA" stationary which contained the following, pre-printed, disclaimer: "'CIGNA' is a registered service mark, licensed for use by subsidiaries of CIGNA Corporation. Products and services are provided exclusively by subsidiaries, including Connecticut General Life Insurance Company, and not by CIGNA Corporation." (Holder Depo. Ex. 1). See, id., 2007 WL 1468555 at *4 n.2 ("the 'CIGNA' logo is not the same thing as the 'CIGNA Corporation' logo"). CIGNA's website, upon which Dr. Kidd also relies, contains a legal disclaimer section which, among other things, says that "CIGNA corporation is a holding company and is not an insurance or an operating company. Therefore, products and services are provided exclusively by subsidiaries and not by CIGNA Corporation." (Docket No. 86-1 at 2).

Additionally, while Mr. Isenhart of Photofax sent his report to Ms. Holder at "CIGNA Group

Insurance," his designation of what company Ms. Holder actually worked for is not any more dispositive than Ms. Holder's uncertainty about the relationship between LINA and CIGNA. CIGNA Group is a mere service mark, not a legal entity. <u>See</u>, <u>Gonzalez-Lopez v. CIGNA Group</u>, 609 F.Supp.2d 161, 164 (D.P.R. 2008)(collecting cases)(there is no personal jurisdiction over CIGNA Group since it is not a legal entity and cannot be sued).

The *sine qua non* of personal jurisdiction is the purposeful availment factor. <u>Air Products and Controls, Inc. v. Safetech Intern., Inc.</u>, 503 F.3d 544, 550 (6th Cir. 2007). Thus, to keep CIGNA Corporation d/b/a CIGNA Group Insurance as a party to this action, it is incumbent upon Dr. Kidd to show that it purposefully availed itself of acting or causing a consequence in Tennessee. She has not done so, and, accordingly, CIGNA is dismissed from this action.

## B. DR. KIDD'S MOTION TO AMEND COMPLAINT

In light of CIGNA's Motion to Dismiss for lack of personal jurisdiction, Dr. Kidd has filed a Motion to Amend her Complaint which would add LINA as a named Defendant in this action. Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, a "court should freely give leave" to amend a complaint "when justice so requires."

Here, justice requires that Dr. Kidd be allowed to amend her Complaint because LINA is a proper Defendant while CIGNA is not. Further, there is no prejudice to the Defendants in allowing the amendment. Since the inception of this case, counsel for CIGNA has been acting as *de facto* counsel for LINA. In fact, at least until the time CIGNA's Motion for Summary Judgment was filed, counsel for CIGNA has taken the position that LINA should be substituted as a Defendant in lieu of CIGNA, and CIGNA's counsel has made arguments on LINA's behalf throughout this litigation.

(See, Docket No. 59 at 1, n.1).[6]

## C. DR. KIDD'S MOTION FOR REVIEW

On September 21, 2010, Magistrate Judge Griffin entered an Order (Docket No. 31) granting Defendants' motions to strike and/or exclude Dr. Kidd's expert witness and expert report involving HIPAA's requirements. Dr. Kidd has filed a Motion for Review of that Order, arguing that the Magistrate Judge's ruling effectively abrogates Fed. R. Civ. P. 26(a)(2)(C)'s provision which sets a time frame for rebuttal expert reports. She also argues that the ruling "unfairly penalizes a plaintiff who does not predict any possible expert testimony a defendant might produce by not permitting the introduction of relevant rebuttal evidence on the subject." (Docket No. 56 at 6).

Because the Magistrate Judge's Order does not pertain to a dispositive motion, this Court's review is limited to whether it "is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a).

Rule 26(a)(2)(C), upon which Dr. Kidd relies, provides:

(C) Time to Disclose Expert Testimony. A party must make these [expert] disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:
    (I) at least 90 days before the date set for trial or for the case to be ready for trial; or
    (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B), within 30 days after the other party's disclosure.

Fed. R. Civ. P. 26(a)(2)(C). Reliance on that rule is misplaced because there was, in fact, a Court

---

[6]Even though a scheduling order within the meaning of Fed. R. Civ. P. 16(a) has ben entered in this case, allowing leave to amend does not contravene that Order. Under the Initial Case Management Order, "[a]ll motions to amend the pleadings and/or add additional parties shall be filed in sufficient time to permit any discovery necessary because of the proposed amendment to be obtained within the time for discovery." (Docket No. 16 at 6). There is no suggestion that discovery would have been different if it had been conducted exclusively on behalf of LINA, as opposed to CIGNA.

Order which set forth the "sequence" for expert disclosures. Specifically, the Initial Case Management Order provided:

> By the close of business May 24, 2010, Plaintiff shall declare to the Defendants (not file with the Court) the identity of her expert witness(es) and provide all the information specified in Rule 26(a)(2)(B).
> By the close of business July 23, 2010, Defendants shall declare to Plaintiff (not file with the Court) the identity of its (sic) expert witness(es) and provide all the information specified in Rule 26(a)(2)(B).
> All expert discovery shall be completed by August 23, 2010.

(Docket No. 18 at 5). However, the Order signed by Magistrate Judge Griffin does not mention rebuttal expert witnesses. It does provide that all expert discovery be completed by August 23, 2010, and that could not occur when Dr. Kidd did not designate her expert until 10:23 p.m. on August 23, 2010.

The Court finds that the ruling of the Magistrate Judge was clearly erroneous. Given the unique facts and circumstances of this case, all parties should have been given an opportunity to designate rebuttal experts.

Accordingly, Plaintiff's Motion for Review is granted. Defendants' motions to strike and/or exclude Plaintiff's expert witness and expert report (Docket Entry Nos. 24, 25, and 26) are denied and Plaintiff's expert witness, Dr. Bysinger, and his expert report are not excluded.

In light of this ruling, the discovery deadline is extended to December 13, 2010 to give Defendants an opportunity to depose Plaintiff's expert. The Court will extend the dispositive motion deadline, if necessary, upon the filing of an appropriate motion.

The Court leaves for another day whether any expert will be allowed to testify on the legal requirements of HIPAA. Nothing herein precludes the filing of a motion in limine to exclude any witness.

## D.  DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  In deciding a motion for summary judgment, the Court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party.  Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 466 (6th Cir. 2003); Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

### B.  Photofax and Isenhart's and CIGNA's Motions for Summary Judgment

Photofax, Mr. Isenhart, and CIGNA move for summary judgment on all of Dr. Kidd's claims, which include her claims for invasion of privacy, civil conspiracy, and negligent and intentional infliction of emotional distress/outrageous conduct.  In response, Dr. Kidd does not oppose the summary judgment motions on her negligent and intentional infliction of emotional distress/outrageous conduct claims (Docket Nos. 66 at 2; 68 at 1-1) and, therefore, summary judgment is granted on those claims.[7]  She does, however, oppose the motions with respect to her invasion of privacy and civil conspiracy claims.

#### 1.  Invasion of Privacy

The tort of invasion of privacy is generally considered to have four strands: (a) public disclosure of private facts; (b) unreasonable intrusion upon the seclusion of another; (c)

---

[7]Defendants also move for summary judgment insofar as Dr. Kidd may be seeking to recover under HIPAA because the statute does not allow for a private cause of action.  However, Dr. Kidd asserts no self-standing HIPAA claim, but instead references HIPAA as providing an appropriate standard of care of which Defendants should have been aware.

appropriation of another's name or likeness; and (d) publicity that unreasonably places another in a false light before the public. Harris v. Horton, 2009 WL 4801719 at *5 n.5 (Tenn. Ct. App. 2009). Here, Plaintiff seeks to recover under the theory that the videotaping of her FCE unreasonably intruded on her right to seclusion.

In Givens v. Millikin, 75 S.W.3d 383, 411 (Tenn. 2002), the Tennessee Supreme Court held that, in accordance with the RESTATEMENT (SECOND) OF TORTS, "a plaintiff may recover damages in Tennessee for an unreasonable intrusion into his or her private affairs." Thus, "'[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Id. (quoting, RESTATEMENT (SECOND) OF TORTS, § 625B). In doing so, the court in Givens quoted with approval the following comment to section 652B:

> The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs.

Id. (quoting, RESTATEMENT (SECOND) OF TORTS, § 625B cmt. c).

Since being formally recognized as a valid cause of action in Tennessee, the tort of intrusion upon seclusion has been the subject of a limited number of published cases, none of which addresses a fact pattern akin to that presented here.[8] For that reason, the parties point to cases from other jurisdictions to support their respective positions.

Defendants cite numerous cases which stand for the general proposition that one can have

---

[8]As counsel for Photofax observes, "[a] lengthy search of Tennessee State Court cases failed to uncover any meaningful authority with respect to invasion of privacy cases involving surveillance." (Docket No. 33 at 12).

no reasonable expectation of privacy when he or she is videotaped performing activities in public. Thus, for example, no liability for invasion of privacy was found where a neighbor directed a video-camera toward his adjacent homeowner's property which "pann[ed] for silly infractions" of local ordinances, Shiller v. Mitchell, 828 N.E.2d 323, 324 & 338 (Ill. App. 2005); where a disability claimant was filmed playing the piano in her church, Creel v. I.C.E. & Assoc., Inc., 771 N.E.2d 1276, 1279-81 (Ind. App. 2002); or where a disability claimant seeking an increase in benefits was filmed riding his motorcycle, mowing his yard, and walking into a chiropractor's office, York v. Gen. Elec. Co., 759 N.E.2d 865, 868-89 (Ohio App. 2001).

Defendants also rely upon a couple of cases in which no liability for invasion of privacy was found where filming or photographing was done from a public place through an unobstructed window. See, e.g., Solomon v. Nat'l Enquirer, Inc., 1996 WL 635384 at *4 (D. Md. 1996)(plaintiff photographed while standing in front of second floor window with the curtains opened). They place particular reliance on Finley v. Hartford Life & Acc. Ins. Co., 2007 WL 4374417 at * (N.D. Cal. 2007) wherein the court found plaintiff had no reasonable expectation of privacy when she was filmed from across the street preparing food in her kitchen.

For her part, Dr. Kidd argues that the cases relied upon by Defendants are distinguishable if for no other reasons than they do not involve a situation where a patient is surreptitiously recorded undergoing a "medical examination." Instead, she directs the Court's attention to cases involving invasions of privacy claims arising in a hospital or medical setting. Thus, for example, she cites case like Noble v. Sears Roebuck and Co., 109 Cal. Rptr. 269, 270-71 (Cal. App. 1979) where the court held that a cognizable claim for invasion of privacy could arise out of an "unreasonably intrusive invasion" which involved a private detective entering plaintiff's hospital

room and securing information from her by deceptive means.   A viable invasion of privacy claim also existed in McDaniel v. Atlanta Coca-Cola Bottling Co., 2 S.E.2d 810( Ga. App. 1939) where plaintiff, hospitalized after allegedly swallowing glass particles, agreed to speak with the lawyers for the bottler, but did not agree to having her hospital room bugged by agents of the lawyers.   Such cases, Plaintiff argues, are analogous to the situation here because they involve intrusion into private medical situations.   She also asserts that the videotaping of her activities at Select's clinic constitutes a medical record and that, under Tennessee law, patient's have a reasonable expectation that his or her medical record will remain private.   McNeil v. Cooper, 241 S.W.3d 886, 894-95 (Tenn. Ct. App. 2007).

A review of the invasion of privacy cases cited by the parties (and numerous other cases) suggests they all have one thing in common – they are intensely fact-driven.   However, "[w]hether [a given] intrusion would be offensive to persons of ordinary sensibilities is ordinarily a question for the fact-finder[.]"   Remsburg v. Docusearch, Inc.,  816 A.2d 1001, 1008 (N.H. 2003).   As the court in Sanders v. American Broadcasting Companies, Inc., 978 P.2d 67 (Cal. 1999) explained: "privacy, for purposes of the intrusion tort, is not a binary, all-or-nothing characteristic. There are degrees and nuances to societal recognition of our expectations of privacy:  the fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law." Id. at 72; see, Lovgren v. Citizens First Nat'l Bank, 534 N.E.2d 987, 989 (Ill. 1989)("the contours of the tort of unreasonable intrusion into the seclusion of another are intuitive to a degree").

Here, there are facts which could lead to the conclusion that the videotaping in this case was not the sort of intrusion which would be highly offensive to a reasonable person.  Such facts include:

the videotaping was done from inside a vehicle parked in a public lot through an unobstructed window during daylight hours; all three windows at the clinic have no blinds and one can see into the clinic from the outside, and see out into the parking lot from the inside; Dr. Kidd was fully clothed when videotaped and wearing the same outfit that she had on in public before entering the clinic; the videotape (which has no sound) captures only that which was reported in the written FCE; the videotape and Isenhart's investigative report was provided only to CIGNA and individuals and representatives of Photofax, Inc.; Dr. Kidd accepts that her claim for LTD benefits was subject to investigation and had no objection to being videotaped while she was out-and-about in public; Dr. Kidd exercises in public at the YMCA, utilizing some of the same equipment and performing some of the same activities as those she performed during her FCE; and Dr. Kidd has not sought any medical treatment for the emotional injuries she is claiming in this case.

On the other hand, there are facts from which a jury could conclude that the intrusion in this case was highly offensive, and would be so to a reasonable person. These facts include: the FCE could be viewed as a medical examination because it measured various parameters regarding the abilities and functions of Dr. Kidd's body; medical examinations usually occur in private; Dr. Kidd believed the examination was private because windows at medical facilities typically use one-way glass, and any filming of patients is usually done only upon written consent[9]; only Dr. Kidd and Select employees were present, adding to the specter of privacy; and Mr. Isenhart was not a casual

---

[9]In its response brief, CIGNA argues that what Dr. Kidd may have believed is irrelevant because the question is whether a reasonable person would find the intrusion highly offensive, not Dr. Kidd. While that may be so, Dr. Kidd is a physician and she can testify about her experience, just as Ms. Odle, as a physical therapist, opines on behalf of Defendants that "[p]hysical therapy clinics are not required to obstruct the view into their gym space" and that "it is not uncommon for physical therapy clinics in the middle Tennessee areas to have windows and doorways that allow for an unobstructed view from outside the facility." (Docket No. 40-1, Odle Aff. ¶ 15).

observer who merely walked by and glanced in the window, but a stranger who was made aware of Dr. Kidd's confidential medical condition and intentionally watched and filmed (with a telephoto lens) the examination.

CIGNA argues, that "the fact [Dr. Kidd] was performing various activities that in some circumstances could be considered private does not create an umbrella of private seclusion." (Docket No. 59 at 19). But again, the matter is one of degree, as well-illustrated by <u>Huskey v. National Broadcasting Co., Inc.</u>, 632 F.Supp. 1282 (N.D. Ill. 1986) wherein a federal prisoner was found to have stated a cause of action against an NBC camera crew which filmed the inmate while exercising in an exercise cage, notwithstanding the network's claim that there could be no intrusion on seclusion in such circumstances. The court in <u>Huskey</u> observed:

> Of course Huskey *could* be seen by guards, prison personnel and inmates, and obviously he was in fact seen by NBC's camera operator. But the mere fact a person can be seen by others does not mean that person cannot legally be "secluded." . . . Further, Huskey's visibility to some people does not strip him of the right to remain secluded from others. Persons are exposed to family members and invited guests in their own homes, but that does not mean they have opened the door to television cameras. Prisons are largely closed systems, within which prisoners may become understandably inured to the gaze of staff and other prisoners, while at the same time feeling justifiably secluded from the outside world (at least in certain areas not normally visited by outsiders).

<u>Huskey</u>, 632 F.Supp.2d at 1287-88. Likewise, a physical therapy clinic can be viewed as essentially closed to casual visitors and a jury could conclude that Dr. Kidd was "secluded" when she underwent the FCE, notwithstanding that she did some of the same activities at the local YMCA, or the fact that a passerby might catch a glimpse of a stranger doing exercises at Select's clinic.

Defendants argue that those seeking injury for an alleged disability should have a lower expectation of privacy, which Dr. Kidd admittedly did. However, with one exception, the cases

relied upon by Defendants are not from Tennessee,[10] and do not involve videotaping an examination. They do, however, indicate that an investigation of a claimant who seeks benefits must be reasonable. See, McClain v. Boise Cascade Corp., 533 P.2d 343, 346 (Ore. 1975)("one who seeks to recover damages for alleged injuries must expect that his claim will be investigated and he waives his right of privacy to the extent of a reasonable investigation"); York, 759 N.E.2d at 868 (discussing whether investigator's actions were "unreasonable" and observing, "[i]t is not unreasonable for an employer to conduct an investigation into a person's injury while the person is receiving workers' compensation benefits, as long as the investigation does not amount to an invasion of the worker's privacy").

This case really comes down to a question of reasonableness and it is a jury question given that  different conclusions can be drawn from the evidence presented. See, Remsburg, 816 A.2d at 1008 (whether an intrusion is offensive "only becomes a question of law if reasonable persons can draw only one conclusion from the evidence").  It will be for the jury to determine whether Dr. Kidd's privacy was invaded by considering the degree, context, circumstances, motives, and setting surrounding the intrusion.  Id. at 1009.

**2.  Civil Conspiracy**

A civil conspiracy is a "combination between two or more persons to accomplish by concert

---

[10]The sole Tennessee case, Lesko v. Tennessee School Bd., 2010 WL 199406 (Tenn. 2010), cited by Photofax for the proposition that "[i]t is impossible for a plaintiff to carry a claim of invasion of privacy when she knew she would be subjected to the video surveillance event that ultimately occurred" (Docket No. 33 at 19) simply does not carry the weight Photofax attaches to it.  There, in an unpublished *per curiam* opinion, the Tennessee Supreme Court upheld the Special Workers' Compensation Appeals Panel's decision that a worker's compensation claimant suffered no permanent injury.  While the evidence included a video surveillance tape of the claimant leaving (but not inside) a physical therapy clinic, there was no claim asserted for invasion of privacy – it was not an issue.

an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." Chenault v. Walker, 36 S.W.3d 45, 52 (Tenn. 2001). "A claim for civil conspiracy must include 'an underlying predicate tort allegedly committed pursuant to the conspiracy.'" Hagan v. Phipps, 2010 WL 3852310 at *5 (Tenn. Ct. App. 2010)(citation omitted).

Preliminarily, Defendants move for summary judgment on the grounds that Dr. Kidd cannot establish her claim for invasion of privacy and, therefore, there is no predicate act so as to support a conspiracy claim. However, the Court has concluded that a jury question exists on Dr. Kidd's invasion of privacy claim and, hence, summary judgment is not warranted on this basis.

In its reply brief, CIGNA argues that Dr. Kidd cannot prevail on her conspiracy claim because there is no evidence that CIGNA or Photofax knew the clinic had uncovered windows, Mr. Isenhart "simply got lucky" when he went to Select and was able to film Dr. Kidd, and there was no "common design" because Mr. Isenhart did not have any contact with LINA until after he had conducted his surveillance.

Of course, CIGNA's arguments overlook the facts that show Ms. Holder ordered the surveillance, scheduled it for when the FCE was to take place, identified the location for the FCE, and fully expected (or it reasonably should have expected) that the FCE would be filmed by a Photofax investigator given that CIGNA was interested in any activity that could be filmed. It will be for the jury to determine whether the videotaping was as fortuitous as CIGNA claims, or rather was part of a common design. See, Robinson v. Township of Waterford, 1989 WL 84569 (6th Cir. 1989)(citations omitted)("'[c]ircumstantial evidence may provide adequate proof of conspiracy'" and "[t]hus the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can 'infer from the circumstances [that

the alleged conspirators] had a meeting of the minds and thus reached an understanding' to achieve the conspiracy's objectives").

## C. **Select's Motion for Summary Judgment**

Select moves for summary judgment forwarding many of the same arguments as those raised by the other Defendants. However, Select also raises an additional argument: Dr. Kidd cannot show Select was a party to the videotaping, or even aware that it was to occur. Dr. Kidd does not oppose this motion and the evidence before the Court shows that Select was not involved with, nor did it facilitate, the videotaping of Dr. Kidd. Accordingly, Select's Motion for Summary Judgment is granted.

## III. **CONCLUSION**

On the basis of the foregoing, the Motions for Summary Judgment filed by Defendants CIGNA and Photofax, Inc. and Chris Isenhart (Docket Nos. 32 & 41) are granted with respect to Plaintiff's negligent and intentional infliction of emotional distress/outrageous conduct claims, but denied with respect to Plaintiff's invasion of privacy and civil conspiracy claims. Select's Motion for Summary Judgment (Docket No. 37) is granted. CIGNA's Motion to Dismiss for Lack of Personal Jurisdiction (Docket No. 44) is granted. Plaintiff's Motion for Leave to Amend Complaint (Docket No. 77) is granted. Finally, Plaintiff's Motion for Review of Magistrate Judge's Order (Docket No. 55) is granted.

_Todd Campbell_
Todd J. Campbell
United States District Judge